PRESENT: Lemons, C.J., Millette, Mims, McClanahan, and Powell, JJ., and Russell and Koontz, S.JJ.

BASF CORPORATION

v.  Record Nos. 140462, 141009 & 141201

STATE CORPORATION COMMISSION, ET AL.

                                            OPINION
                                  JUSTICE LEROY F. MILLETTE, JR.
JAMES CITY COUNTY, ET AL.                April 16, 2015

v.  Record Nos. 140470 & 141010

STATE CORPORATION COMMISSION, ET AL.

                FROM THE STATE CORPORATION COMMISSION

    These consolidated appeals of right by James City County, Save the James Alliance Trust, and James River Association (collectively, "JCC"), and BASF Corporation ("BASF") arise from proceedings before the State Corporation Commission (the "Commission").

    By an initial Certificate Order and an Amending Order, the Commission issued to Virginia Electric and Power Company d/b/a Dominion Virginia Power ("Dominion") certificates of public convenience and necessity ("CPCNs") authorizing the construction of electric transmission facilities (the "Project").  BASF challenges the approval of the transmission line's route across a sensitive environmental remediation site on its property along the James River.  JCC challenges the approval of two main features of the Project: a new 500 kilovolt ("kV") overhead transmission line that will cross the James River and an

associated switching station that will be located in James City County. JCC argues that the switching station is a not a "transmission line" under Code § 56-46.1(F), and therefore subject to local zoning ordinances.

We conclude that the Commission did not err in its construction or application of Code § 56-46.1's requirements that Dominion "reasonably minimize adverse impact on scenic assets, historic districts, and environment of the area concerned," and that the record is not without evidence to support its findings. We hold, however, that the Commission did err in concluding that a switching station is a "transmission line" under Code § 56-46.1(F). We will therefore affirm the orders as to appellant BASF, and affirm in part, reverse in part, and remand as to the JCC appellants.

I. PROCEEDINGS

In 2012, Dominion filed an application with the Commission seeking the issuance of the CPCNs under Code § 56-265.2 of the Virginia Utility Facilities Act, and approval under Code § 56-46.1, to construct the Project.

Code § 56-265.2(A) provides that "[i]t shall be unlawful for any public utility to construct . . . facilities for use in public utility service . . . without first having obtained a certificate from the Commission that the public convenience and necessity require the exercise of such right or privilege."

2

This provision also requires compliance with the provisions of Code § 56-46.1 for the issuance of a certificate to construct overhead transmission lines of 138 kV or more.

Code § 56-46.1 directs the Commission to consider several factors when reviewing the utility company's application for the certificate. As relevant here, subsection (A) of the statute provides: "Whenever the Commission is required to approve the construction of any electrical utility facility, it shall give consideration to the effect of that facility on the environment and establish such conditions as may be desirable or necessary to minimize adverse environmental impact." Code § 56-46.1(A). Here, the term "'environmental' shall be deemed to include in meaning 'historic.'" Code § 56-46.1(D). Subsection (A) also directs that "the Commission (a) shall consider the effect of the proposed facility on economic development within the Commonwealth . . . and (b) shall consider any improvements in service reliability that may result from the construction of such facility." Code § 56-46.1(A).

Subsection (B) of Code § 56-46.1 then provides, in relevant part: "As a condition to approval the Commission shall determine that the [proposed transmission] line is needed and that the corridor or route the line is to follow will reasonably minimize adverse impact on the scenic assets, historic districts and environment of the area concerned."

3

Dominion's application addressed the need for the Project and described its proposed features. Dominion represented that the construction of this additional transmission capacity was needed to assure continued reliable electric service to its customers in the North Hampton Roads Area.[1] The Project, according to Dominion, was the best means for meeting this need while "reasonably minimiz[ing] adverse impact on the scenic assets, historic districts and environment of the area concerned," as required by Code § 56-46.1(B).

The Commission undertook an investigation, received public comments and assigned a Hearing Examiner to conduct the proceedings and issue a report on Dominion's application. Two days of public witness hearings were then conducted, followed by a nine-day long evidentiary hearing for the purpose of receiving evidence offered by Dominion, respondents, including JCC and BASF, and the Commission's staff. Following its receipt of the Hearing Examiner's report, the Commission issued the first of the orders challenged in this appeal.

---

[1] The North Hampton Roads Area, as referred to in this case, includes the following 14 counties and 7 cities: the counties of Charles City, James City, York, Essex, King William, King and Queen, Middlesex, Mathews, Gloucester, King George, Westmoreland, Northumberland, Richmond, and Lancaster, and the cities of Williamsburg, Yorktown, Newport News, Poquoson, Hampton, West Point, and Colonial Beach.

4

## A. Evidentiary Hearing

The record below is extensive, but included the following basic facts.

Under federal law, Dominion must comply with North American Electric Reliability Corporation ("NERC") standards, which have been adopted by the Federal Energy Regulatory Commission ("FERC").  See Piedmont Envtl. Council v. Virginia Elec. & Power Co., 278 Va. 553, 559-60, 684 S.E.2d 805, 808 (2009) (explaining federal regulation of public utilities like Dominion that operate "bulk electric transmission systems").  Dominion presented evidence that, in order to monitor whether its electric transmission system is in compliance with NERC reliability standards, Dominion continually assesses the system's future reliability using load flow modeling studies. Based on the load flow modeling evidence in this case, previous studies had indicated that normal load growth in the North Hampton Roads Area would result in NERC reliability violations by 2019.  However, in order to comply with new regulations, Dominion determined that six of its local coal-fired generation units (two at the Yorktown Power Plant and four at the Chesapeake Power Plant) would need to be shut down.  According to Dominion, the retirement of just one unit at Yorktown was enough to cause reliability violations to begin in the summer of 2015.

To meet the above-stated need, Dominion proposed in its application for the CPCNs that the Project include the construction of (1) approximately seven to eight miles (depending upon the specific route across the James River) of a new 500 kV overhead transmission line (the "Surry-Skiffes Creek Line"), (2) approximately 20 miles of a new 230 kV overhead transmission line (the "Skiffes Creek-Whealton Line"), and (3) a new switching station required to interconnect the 500 kV line to the 230 kV line (the "Skiffes Creek Switching Station").[2]

Dominion's application, at issue in today's appeal, presented the Surry-Skiffes Creek Line over the James River and onto BASF's property, with several "Variations" as to the exact route crossing the James River. As an alternative to the Surry-Skiffes Creek Line, Dominion also offered for the Commission's consideration a different route extending 38 miles from

---

[2] The 500 kV Surry-Skiffes Creek Line would begin on Hog Island at Dominion's existing Surry Switching Station near the Surry Nuclear Power Station in Surry County and extend to the south shore of the James River. The line would then cross the James River and come ashore on BASF's property in a dormant industrial area at one of two locations. The line would proceed through BASF's property and beyond to the Skiffes Creek Switching Station to be constructed on property owned by Dominion in James City County, through which several transmission lines currently cross. The 230 kV Skiffes Creek-Whealton Line would then proceed for approximately 20 miles along an existing Dominion right-of-way from the Skiffes Creek Switching Station to the existing Whealton Substation located in the City of Hampton.

Dominion's existing Chickahominy Substation in Charles City County to the new Skiffes Creek Switching Station in James City County (the "Chickahominy-Skiffes Creek Line"). However, Dominion preferred the Surry-Skiffes Creek Line for the Project based on significant differences as to adverse impact and cost: the Chickahominy-Skiffes Creek Line would pass in close proximity to more residences than the Surry-Skiffes Creek Line. Dominion also stated that, because approximately 25 miles of the right-of-way is unimproved, the Chickahominy-Skiffes Creek Line "crosses significantly more forested land, open marshland, wetland and perennial waterbodies and will require much more forest land to be cleared and forested wetlands to be converted to scrub shrub community." In addition, Dominion's estimated cost of the Chickahominy-Skiffes Creek Line was more than $50 million above the estimated cost of the Surry-Skiffes Creek Line.[3]

Under Code § 56-46.1, as part of the evaluation process, the Hearing Examiner and then Commission must determine whether new Projects "reasonably minimize adverse impact on the scenic assets, historic districts and environment of the area concerned." Code § 56-46.1(B). Both BASF and JCC presented

_____

[3] The estimated total cost of the Project is approximately $151 to $155 million dollars using the Surry-Skiffes Creek Line, compared to $213 million using the Chickahominy-Skiffes Creek Line.

7

evidence of adverse impacts caused by the proposed Surry-Skiffes Creek Line.

The BASF property is a former manufacturing site undergoing active remediation subject to both Environmental Protection Agency ("EPA") and Department of Environmental Quality ("DEQ") corrective action. Dominion's preferred route of the Surry-Skiffes Creek line ("Variation 1") crosses the middle of BASF's property, the most sensitive area of environmental remediation, containing zinc contaminants. This area is identified as Area 4C. The plans underway to remediate Area 4C contain three main mitigation measures: a capped landfill, a bio-barrier trench, and a phytoremediation plot of poplar trees. BASF offered expert testimony that a transmission tower in this area would interfere with the bio-barrier, that the transmission line will render the phytoremediation plot ineffective, and that Variation 1 would generally threaten and delay successful remediation.

BASF's position was that, if the Surry-Skiffes Creek line was selected, the route identified as Variation 4 was its preferred route. Variation 4 crosses the northern boundary of the property (approximately one half-mile north of Variation 1) and thereby avoids Area 4C. In order for Variation 4 to be viable, the James City County Economic Development Authority (the "EDA") would have to agree to provide Dominion a right-of-

8

way easement, as Dominion determined that it does not have the authority to exercise eminent domain over the property.

BASF has already spent over $15 million dollars in the process of remediating the property and preparing it for redevelopment.  BASF presented testimony that Variation 1 could delay remediation efforts and result in BASF failing to meet its EPA-mandated remediation deadline in 2020, thereby resulting in treble damages.  Further, according to BASF witnesses, a transmission line bisecting the property substantially damages prospects for future development of the property.

In addressing the issue of scenic and historic preservation, JCC presented expert testimony that any overhead transmission line would disrupt scenic vistas and historic landmarks, and expressed its desire for an underground transmission line.  As the experts observed, the Surry-Skiffes Creek Line would be located in the vicinity of the Historic Triangle of Jamestown, Yorktown and Williamsburg.  According to the experts, a portion of the overhead line would be visible from the Colonial National Historic Parkway.  The line would be most visible from Carter's Grove, a mid-eighteenth century dwelling and a National Historic Landmark located on the north shore of the James River, where the line would be located between one-half mile to one mile south of Carter's Grove,

9

depending upon the line's route across the James River. As for the James River itself, according to the experts, the line would pass within a portion of the river that has been designated by Code § 10.1-419 as a "[H]istoric [R]iver," and would be visible from the Captain John Smith National Historic Water Trail. JCC presented testimony that these sites have received state and national recognition on historic registers and should be free from such visual intrusion. JCC further presented testimony that the historical, cultural, and ecological importance of the area would be impacted by an overhead transmission line, and the Project could potentially damage the ongoing attempt to have the area designated as a World Heritage Site.

Dominion countered with its own experts, who argued that while these adverse impacts do exist, they could be reasonably minimized. The specific responses of these experts are addressed in Parts IV.B. and V.B., infra, where we analyze the evidentiary issues under Code § 56-46.1.

B. Hearing Examiner's Report

In August 2013, the Commission's Hearing Examiner issued a 178 page report that summarized the extensive record, analyzed the evidence and issues, and made numerous findings and recommendations for the Commission's consideration. As relevant here, after finding a need to upgrade Dominion's electric

system, the Hearing Examiner's express findings and recommendations included the following:

- The [p]roposed Project is the least cost[ly] viable alternative for addressing the identified NERC reliability violations presented in this case, can be constructed in a timely manner, and is the best alternative in this case;[4]

- The [p]roposed Project's overhead crossing of the James River will have a limited visual impact on one section of the Colonial Parkway and a very limited impact on a small portion of Jamestown Island. Overall, the [p]roposed Project will reasonably minimize the adverse impacts on the scenic assets, historic districts, and environments;

- The route crossing the James River should follow James River Crossing Variation 4 on the condition that the [EDA] and Dominion . . . conclude a right-of-way agreement within three weeks of the Commission's final order. If such an agreement is not [so] concluded . . . then the route crossing the James River should be James River Crossing Variation 1;

- The Commission may or may not decide to address whether Skiffes Creek Switching Station is a "transmission line" for purposes of [Code] § 56-46.1[(F).]

---

[4] In this regard, the Hearing Examiner found that "[t]he [Chickahominy] [a]lternative [p]roject is a viable alternative, is electrically equivalent to the [p]roposed Project and can be constructed in a timely manner. However, the [Chickahominy] [a]lternative [p]roject has a higher cost than the [p]roposed Project and will have a greater impact on scenic assets, historic districts and the environment." The Hearing Examiner also found that "[a]dditional generation . . . resolve[s] the identified NERC reliability violations, but at a significantly higher price and at a greater risk of failing to be completed by the date needed."

11

The Hearing Examiner therefore recommended that the Commission adopt the findings of the Report and grant the Application subject to the recommendations in the report.

C. Commission's Certificate Order

Based on its review of the record and the Hearing Examiner's findings and recommendations, the Commission issued the November 26, 2013 order (the "Certificate Order") granting the CPCNs to Dominion. After evaluating numerous alternatives offered for its consideration, the Commission found that "[t]he engineering evidence in this case is overwhelming" in establishing that the construction of an overhead 500 kV transmission line is the best way to address the needed upgrade to Dominion's electric system. The Commission then compared Dominion's two alternative 500 kV proposals: the Surry-Skiffes Creek Line and the Chickahominy-Skiffes Creek Line. The Commission concluded that the record supported the Hearing Examiner's findings that the Surry-Skiffes Creek Line "'is the least cost[ly] viable alternative for addressing the identified NERC reliability violations presented in this case, can be constructed in a timely manner, and is the best alternative in this case.'" Further, the Commission cited and agreed with the Hearing Examiner's finding that the proposed Project "reasonably minimize[ the] adverse impact on the scenic assets, historic

12

districts[,] and environment [in] the area concerned" in accordance with Code § 56-46.1(B).

The Commission also agreed with the Hearing Examiner's recommended approval of Variation 4 as the route for the Surry-Skiffes Creek Line.  The Commission found that "the environmental and economic development considerations in particular" favored Variation 4 over Variation 1.  The Commission declined, however, to adopt the Hearing Examiner's recommendation for the contingency approval of Variation 1, should Dominion's negotiations with the EDA over the right-of-way prove fruitless.  The Commission indicated that it fully expected Dominion and the EDA to complete the negotiations necessary for Variation 4.

As to whether the construction of the Skiffes Creek Switching Station is subject to James City County's zoning ordinances, the Commission addressed the issue and concluded that the switching station constitutes a "transmission line" for purposes of Code § 56-46.1(F), and is thus exempt from the zoning ordinances.  "From an engineering standpoint . . . the Skiffes Creek Switching Station will be an electrically, physically, and operationally inseparable part of several high voltage transmission lines," the Commission explained.  The Commission reasoned, "[t]he Skiffes Creek Switching Station enables a number of transmission circuits to be completed and

13

connected through transformers and other associated equipment." The Commission thus concluded that the transmission line CPCNs would include the Skiffes Creek Switching Station.

Accordingly, in the Certificate Order, the Commission approved the Project for the construction of the 500 kV Surry-Skiffes Creek Line with Variation 4, the Skiffes Creek Switching Station and the 230 kV Skiffes Creek-Whealton Line.

### D. Commission's Amending Order

Dominion was, ultimately, unsuccessful in negotiating a right-of-way with the EDA, and thus could not comply with this condition of the Certificate Order. Dominion sought to amend the Certificate Order as Variation 4 was no longer viable. The Hearing Examiner conducted a second evidentiary hearing to determine if a portion of the approved route for the Surry-Skiffes Creek Line must be modified in order to allow the Project to be constructed. While continuing to prefer Variation 1, Dominion proposed in the alternative that the Commission approve a limited adjustment to Variation 4, identified as Variation 4.1. This route would bypass the EDA property but would require Dominion to obtain new right-of-way easements from other affected landowners. BASF recommended a similar adjustment, identified as Variation 4.2, and continued to oppose Variation 1. For reasons unrelated to the environmental dispute, pertaining most prominently to the grade of the land,

14

it became apparent that Variation 4.2 was inappropriate, and BASF altered its position to favor Variation 4.1 as between the remaining options under consideration.  After concluding Dominion was not able to implement Variation 4, the Hearing Examiner "found advantages and disadvantages to Variations 1 and 4.1, and recommended Variation 4.1."

Upon its review, the Commission instead found that Variation 1 had "become the best variation to satisfy the Code."[5] The Commission approved Variation 1 based on the risk that construction of the Project would not be completed in time to address the NERC violations if it approved one of the adjusted variations to Variation 4.  The Commission found, among other factors, that approval of one of the adjusted variations could result in significantly delaying the U.S. Army Corps of Engineers' Project review, which had to be completed before Dominion could begin construction.

Having previously approved Variation 4, the Commission noted that "Variation 1 will impact certain properties differently than Variation 4."  However, the Commission found that "Variation 1 allows Dominion to: (1) reasonably minimize

---

[5] The Commission noted that in the Certificate Order it had agreed with the Hearing Examiner's analysis of the various James River crossing variations and findings that "the [c]ertificated Project, regardless of which variation for the Surry-Skiffes Creek Line is used, reasonably minimizes the adverse impacts on the scenic assets, historic districts, and environment and otherwise satisfies the Code."

adverse environmental impacts, including impacts to historic resources and scenic assets; (2) cross the James River with less visual impact to Carter's Grove . . . among other properties in the area; (3) bypass the EDA property that has obstructed Variation 4; and (4) address significant reliability risks to the North Hampton Roads Area in a timely manner."  By order dated February 28, 2014 (the "Amending Order"), the Commission amended the Certificate Order by authorizing Dominion to construct the Project using Variation 1.  On April 10, 2014, the Commission entered an additional order denying BASF's petition for reconsideration of the Amending Order.

## II. MOTION TO DISMISS

Both BASF and JCC appeal from the Certificate Order and the Amending Order, with BASF additionally appealing from the Commission's order denying BASF's motion for reconsideration of the Amending Order.

As a preliminary procedural matter, Dominion has filed a motion to dismiss the JCC and BASF appeals challenging the Certificate Order based on Dominion's interpretation of Rule 5:21, which governs appeals from the Commission.  Dominion urges the Court to dismiss BASF's appeal as to the Certificate Order and JCC's appeal in its entirety on the ground that we lack

16

jurisdiction under Rule 5:21(a).[6] Dominion argues that it alone filed a notice of appeal of the Certificate Order under Rule 5:21(a)(3); JCC and BASF merely filed notices of participation under 5:21(a)(6). Because Dominion decided not to proceed with its appeal, it reasons that the jurisdictional basis for the appeals of all parties pertaining to the Certificate Order has evaporated.

Dominion originally filed a notice of appeal from the Certificate Order, pursuant to Rule 5:21(a)(3), because Dominion had not been awarded its preferred route. JCC and BASF subsequently filed notices of participation pursuant to Rule 5:21(a)(6). When the Commission then issued the Amending Order, moving the route to Variation 1, Dominion determined that it would not file a petition for appeal from the Certificate Order. However, JCC and BASF proceeded to file petitions for appeal from the Certificate Order, pursuant to Rule 5:21(a)(7). Dominion argues that because it was the only party to file a notice of appeal from the Certificate Order, the petitions for appeal filed by JCC and BASF from that same order "were mooted" when Dominion did not pursue its petition for appeal, as "there

_____

[6] The motion to dismiss pertains directly to the appeals arising out of the Certificate Order, Record Numbers 140470 and 140462. Dominion also argues that, if granted, the motion would render moot all issues not specifically relating to BASF's Variation dispute arising from the Amending Order.

17

was no [Dominion] appeal in which they could participate." We disagree.

"[B]oth the rules of this Court and of the Commission are liberally applied and construed to the end that all parties having an interest in any matter in controversy before the Commission be permitted to intervene and to appeal." Blue Cross of Virginia v. Commonwealth, 218 Va. 589, 597, 239 S.E.2d 94, 98 (1977).

Rule 5:21(a)(6) expressly provides, in relevant part, that "each party who has not filed a notice of appeal and who intends to participate in the appeal shall file in the office of the clerk of the Commission and shall mail to every other party a notice that he intends to participate as an appellant . . . . Every party who seeks reversal or modification of the order appealed from shall be deemed an appellant . . . ." JCC and BASF were thus deemed appellants under the Rule in their challenge to the Certificate Order, and the Rule contains no provision for terminating that status by virtue of the party that filed the notice of appeal opting to no longer pursue it. The Rule does not state that jurisdiction ceases should the party that originally noticed the appeal fail to proceed at some juncture in the future. We thus find it appropriate to reach the merits of the case.

III.  STANDARDS OF REVIEW

We are guided by well-settled principles in our review of the Commission's decision.  The Constitution of Virginia and statutes enacted by the General Assembly give the Commission "'broad, general and extensive powers'" in regulating public utilities.  Office of Attorney Gen. v. State Corp. Comm'n, __ Va. __, __, 762 S.E.2d 774, 778 (2014) (quoting Virginia Elec. & Power Co. v. State Corp. Comm'n, 284 Va. 726, 735, 735 S.E.2d 684, 688 (2012)).  This authority influences our standards of review in this case.

In considering evidentiary findings of the Commission, this Court is bound to a highly deferential standard.  "The Commission is charged with the responsibility of finding the facts and making a judgment," Appalachian Voices v. State Corp. Comm'n, 277 Va. 509, 516, 675 S.E.2d 458, 461 (2009) (quoting Northern Virginia Elec. Coop. v. Virginia Elec. & Power Co., 265 Va. 363, 368, 576 S.E.2d 741, 743-44 (2003)), and its decision comes to this Court with "'a presumption of correctness.'" Office of Attorney Gen., __ Va. at __, 762 S.E.2d at 778 (quoting Appalachian Power Co. v. State Corp. Comm'n, 284 Va. 695, 703, 733 S.E.2d 250, 254 (2012)).  This means "[w]e will not substitute our judgment in matters within the province of the Commission and will not overrule the Commission's findings of fact unless they are contrary to the evidence or without

19

evidentiary support." Level 3 Commc'ns of Va., Inc. v. State

Corp. Comm'n, 268 Va. 471, 474, 604 S.E.2d 71, 72 (2004) (citing

Virginia Gas Distrib. Corp. v. Washington Gas Light Co. 201 Va.

370, 375, 111 S.E.2d 439, 443 (1959)).

    This Court reviews matters of law de novo. Syed v. ZH

Techs., Inc., 280 Va. 58, 69, 694 S.E.2d 625, 631 (2010).

However, "the Commission's decision is entitled to the respect

due judgments of a tribunal informed by experience, and we will

not disturb the Commission's analysis when it is 'based upon the

application of correct principles of law." Appalachian Voices,

277 Va. at 516, 675 S.E.2d at 461 (internal quotation marks

omitted).  Keeping these principles in mind, we proceed to the

merits.

IV.  BASF'S APPEAL

    In BASF's three assignments of error, BASF asserts, first,

that the Commission erred as a matter of law in finding

Variation 1 reasonably minimizes adverse impacts under Code

§ 56-46.1(B) based merely on the unavailability of Variation 4.

BASF further argues that the Commission erred as a matter of law

in determining whether Code § 56-46.1 was satisfied by weighing

of the transmission system reliability concerns together with

the adverse impacts, instead of as separate processes.  Next,

BASF contends the Commission erred in approving Variation 1,

both by wrongly finding that Variation 1 reasonably minimizes

20

the adverse environmental impact to Area 4C, and by disregarding Variation 1's destruction of the property's development potential. Finally, BASF argues that the Commission erred in rejecting the Hearing Examiner's recommendation in favor of Variation 4.1 because it is the only available route that reasonably minimizes adverse impacts.

### A. Construction of Code § 56-46.1(B)

BASF's first assignment of error argues that the Commission erred as a matter of law in approving Variation 1 in two ways. As matters of law, the Court reviews these questions de novo. Syed, 280 Va. at 69, 694 S.E.2d at 631.

### 1. Action by "Default"

First, BASF contends the Commission chose Variation 1 in the Amending Order simply because it determined that Variation 4 was unavailable due to the EDA's failure to provide the necessary easement. In doing so, the Commission, according to BASF, arrived at Variation 1 by default. BASF argues that the Commission stated that it met the requirements of the statute in a conclusory manner and failed to rely on any actual analysis to determine whether Variation 1 would in fact reasonably minimize the adverse impacts as required under Code § 56-46.1(B).

The statute requires that the Commission "determine" that the variation reasonably minimizes adverse impacts. Code § 56-46.1(B). In the context of this statute, the Court has

21

previously quoted Webster's New International Dictionary to define "determine" as "to fix conclusively or authoritatively . . . to settle a question or controversy about . . . to come to a decision concerning <u>as the result of the investigation or reasoning</u> . . . to settle or decide by choice of alternatives or possibilities." <u>Board of Supervisors v. Appalachian Power Co.</u>, 216 Va. 93, 103, 215 S.E.2d 918, 925 (1975) (emphasis added).

Had the Amending Order provided merely a conclusory recitation of the statutory language, absent investigation or reasoning, BASF would undoubtedly have grounds for complaint. This, however, is not the record before us. The Amending Order includes factors considered by the Hearing Examiner in comparing Variation 1 to Variation 4.1, not Variation 4, indicating that the Commission indeed undertook a comparison between Variation 1 and the new route. The Commission expressly considered many of the same factors enumerated by the Hearing Examiner:

> [T]he Commission agrees . . . that Variation 1 will have less visual impact than Variation 4.1 on certain historic resources, including Carter's Grove. . . . Variation 1 would be located farther than Variations 4.1 and 4.2 from Carter's Grove and from other, more distant historic resources. On the other hand, an environmental advantage of Variations 4.1 and 4.2 is that these variations avoid certain environmental remediation areas on the BASF property which Variation 1 would cross.

The Commission ultimately weighed these competing claims differently than the Hearing Examiner, granting visual impact

22

and construction schedule more relative weight.  This is not error as a matter of law, however.  The Commission clearly engaged in reasoning on the record evaluating relevant factors, and concluded that "[b]ased on the record, the Commission finds that the Certificated Project using Variation 1 would reasonably minimize adverse impact to the scenic assets, historic districts, and environment of the project area."

2. Process of Weighing Adverse Impact

Next, BASF argues that the Commission erred as a matter of law by weighing the need to upgrade Dominion's transmission system against the adverse impacts of Variation 1.  According to BASF, the statute requires the Commission to both establish need and reasonably minimize adverse impacts, and by considering need and the Project's construction schedule as a part of the impact analysis, the Commission is accomplishing only the former.

"When construing a statute, our primary objective is to ascertain and give effect to legislative intent, as expressed by the language used in the statute."  Cuccinelli v. Rector & Visitors of the Univ. of Va., 283 Va. 420, 425, 722 S.E.2d 626, 629 (2012) (internal quotation marks and citation omitted) (emphasis added).  Code § 56-46.1 does not state the factors to be considered in addressing the listed adverse impacts and does not indicate whether these two tests must be undertaken independently of each other.  It merely states that adverse

23

impact should be "reasonably minimize[d]."  Something is "reasonable" when it is "[f]air, proper, or moderate under the circumstances; sensible."  Black's Law Dictionary 1456 (10th ed. 2014).  The essence of reasonableness under the law is prudent action in context; there can be no error in linking a reasonability standard to the circumstances at large.

The Commission, pursuant to Code § 56-46.1(B), determines whether a need for the proposed infrastructure exists.  In doing so, as explained in the Certificate Order, the Commission must assess the magnitude and timing of any such need.  The statute specifically calls for "verif[ication of] the applicant's load flow modeling, contingency analyses, and reliability needs presented to justify the new line and its proposed methods of installation," in determining need.  Code § 56-46.1(B).  Added to these factors, along with minimizing adverse impacts under subsection (B), are the costs of such construction.  See Board of Supervisors, 216 Va. at 104, 215 S.E.2d at 926 (Commission properly considered, among other factors, "economic and environmental factors," "reliability of electric service," and "engineering feasibility" in approving route for transmission line);  Town of Mt. Crawford v. Virginia Elec. and Power Co., 220 Va. 645, 650, 261 S.E.2d 311, 314 (1980) (affirming Commission's rejection of locality's proposed alternative route for new transmission line based on evidence showing that, among

24

other things, the "deviation would substantially increase the cost of the entire line").

The adverse impacts of a proposed project are not to be considered in a vacuum. When presented with an application for transmission line construction, the Commission must "balance" adverse impacts along with other "factors" and "traditional considerations." Board of Supervisors, 216 Va. at 100, 215 S.E.2d at 923-24. Then the Commission, "as a tribunal informed by experience," Appalachian Voices, 277 Va. at 516, 675 S.E.2d at 461 (citation and internal quotation marks omitted), must decide within the parameters of the statute what best serves the "total public interest." Board of Supervisors, 216 Va. at 104, 215 S.E.2d at 926. We conclude that the use of the word "reasonably" demonstrates the General Assembly's recognition of the multifactorial balancing that goes into such an investigation, and we find that the Commission did not err.

B. Evidentiary Challenges Under Code § 56-46.1

BASF's second and third assignments of error are closely related, so we will address them together. BASF challenges the evidentiary support for the Commission's choice of Variation 1 over Variation 4.1. BASF contends that there is not sufficient evidence to support the contention that Variation 1 would reasonably minimize environmental impacts of the Surry-Skiffes Creek Line; rather, Variation 4.1 is the only alternative that

would reasonably minimize the adverse environmental impacts by traversing the northern boundary of BASF's property. Variation 1, according to BASF, would maximize those impacts and destroy the property's developmental potential by bisecting the property through Area 4C, that is, the portion of the property undergoing environmental remediation. Thus, BASF concludes, the Commission's approval of Variation 1 violates Code § 56-46.1(B).

As this portion of the appeal challenges the evidentiary findings of the Commission, we must review the evidence in light of our highly deferential standard of review. We find fault with the Commission only if its findings are "contrary to the evidence or without evidentiary support." Level 3 Commc'ns, 268 Va. at 474, 604 S.E.2d at 72.

### 1. Selection of Variation 1

First, a thorough review of the record shows that it is not without evidence to support the Commission's finding that the Project, using Variation 1, will reasonably minimize adverse impacts as required by the statute.

The property was previously an industrial operations and manufacturing site that caused substantial soil and groundwater contamination. As part of the environmental remediation efforts within the former main industrial area known as Area 4C, consisting of approximately 30 acres, BASF excavated several lagoons and surface impoundments and reinterred the materials

26

into a stabilized capped landfill.  To capture additional contaminants, BASF has developed plans to construct a permeable reactive barrier ("bio-barrier") near the landfill.  BASF is also planning the creation of a phytoremediation plot on Area 4C.  This involves selective plant growth on the property to minimize the migration of contaminants by binding them in the soil while lowering the water table.

The dispute over the Project's adverse environmental impact to BASF's property centers on the Commission's approval of Dominion's construction of a transmission tower in Area 4C for the Surry-Skiffe's Creek Line, using Variation 1.  BASF's remediation specialist, Vernon Burrows, testified that the placement of the tower in Area 4C conflicts with BASF's remediation efforts, including the bio-barrier and the phytoremediation plot, and would "result in serious environmental damage to the BASF property."

Dominion, on the other hand, presented expert testimony indicating that the construction of the tower in Area 4C will have minimal environmental impact.  One such witness was Mark Allen, a Dominion civil engineer, who is responsible for the management of all of the high voltage transmission designs in Dominion's system.  This includes assuring that all such designs meet established standards for safety and reliability.  Another such witness was Cathy Taylor, director of Dominion's Electric

27

Environmental Services Department, whose responsibilities include oversight of environmental compliance and remediation.

Allen submitted testimony that the only tower required in Area 4C would not be located on the capped landfill. He also stated that the landfill could successfully be spanned by the transmission line proposed in Variation 1, such that no construction activity would occur on the capped landfill. In contrast to Burrows' statements that the foundations for the tower would be installed by "drilled piles," a method that can cause displacement of contaminates, Allen and Taylor both testified that Dominion would use "pipe pile foundations" that would be driven into the ground by vibration, resulting in minimal disruption of surrounding soil and migration of contaminated groundwater. Taylor testified that they would work with BASF to reconfigure the location of the tower or bio-barrier, if necessary, in order that the tower would not interfere with the construction and operation of the bio-barrier. Additionally, Taylor stated that there is "more than enough space to safely place the tower [and bio-barrier] in [Area 4C]." As to BASF's plan for phytoremediation, while BASF will be unable to plant hybrid poplars in the right-of-way area as it had planned, Taylor testified that there are numerous alternative grasses and small plants that can be used for

28

phytoremediation that would be consistent with the mandatory standards for transmission line right-of-way maintenance.

The DEQ, which is overseeing the remediation of Area 4C, also submitted an extensive report to the Commission regarding the proposed Project, including Variation 1. The DEQ, however, did not indicate in the report that Variation 1 was incompatible with BASF's remediation of Area 4C as claimed by BASF. Rather, the DEQ recommended without preference that one of the proposed routes for the Surry-Skiffes Creek Line be used, as opposed to the route for the alternative Chickahominy-Skiffes Creek Line.

While vigorously contested, we cannot say that the Commission's selection of Variation 1 was without evidence to support it.

2. Rejection of Variation 4.1

Second, the record was not without evidence to support the Commission's rejection of Variation 4.1.

This is due, in large part, to evidence regarding the construction schedule risks associated with Variation 4.1. This evidence was introduced through the testimony of Elizabeth Harper, a Dominion siting and permitting specialist for electric transmission lines. According to her testimony, Variation 1 has the shorter construction schedule for addressing the urgent need to complete the Project. She stated that there was a greater risk with Variation 4.1 that construction of the Project would

29

not be completed in time to address the NERC violations. This risk was posed because Variation 4.1 had not yet undergone review by the U.S. Army Corps of Engineers, which must be completed before Dominion can begin construction on the Project. Delay caused by this additional review could then result in Dominion having to request an unprecedented fifth-year extension from the EPA to delay shutting down certain of its Yorktown coal fired units. Harper stated that "the parameters for obtaining such an extension are not fully known."

Based on this evidence, the Commission found that, "while there is no absolute schedule certainty for any route, approval of Variation 4.1 . . . would present for customers in the North Hampton Roads Area an increased and unreasonable risk, as compared to Variation 1, that the [c]ertificated Project would not be constructed in time to ensure reliable service to those customers." In light of this record, and in light of the fact that, as discussed in Part IV.A.2., supra, the Commission was permitted to consider the construction schedule in its evaluation, we cannot say the Commission's rejection of Variation 4.1 was without evidence to support it.

### 3. Selection of Variation 1 Despite Adverse Impact

Finally, the record is not without evidentiary support for the Commission's approval of Variation 1 despite any adverse effect the route might have on future economic development of

30

BASF's property. Code § 56-46.1(A) expressly requires the Commission to consider among the other statutory factors the route's effect "on economic development within the Commonwealth." Acting within this statutory authority, the Commission considered this factor in the broader context of Dominion's customers in the affected region, and found as follows: "The timely construction of Variation 1 and the rest of the [c]ertificated Project are necessary to address significant reliability risks in the North Hampton Roads Area. Customers in these counties and cities include citizens, schools, local governments, and businesses that depend on reliable power for a variety of needs. As required by statute, we have considered the impact on economic development in the Commonwealth and . . . approve Variation 1." Both as a matter of law and as a matter of evidentiary inquiry, the Commission did not err by considering the impact of economic development on residents of the entire region and not simply to BASF.

## V.  JCC'S APPEAL

In JCC's three assignments of error, JCC argues, first, that the Commission erred as a matter of law in its construction and application of Code § 56-46.1(A) and (B) by limiting its consideration of routes for the transmission line to those proposed by Dominion in its application. Like BASF, JCC argues that the Commission erred as a matter of law by limiting its

31

inquiry to a one-step balancing process as opposed to a two-step inquiry in which need is first established and that reasonableness is evaluated separately from need. Second, JCC contends the Commission erred in finding that the route of the Surry-Skiffes Creek Line reasonably minimizes its adverse impacts as required under Code § 56-46.1. Third, JCC argues the Commission erred in its construction and application of Code § 56-46.1(F) in finding that the Skiffes Creek Switching Station is a "transmission line" under this provision and thus exempt from local zoning regulations.

A. Construction of Code § 56-46.1(A) and (B)

JCC's first assignment of error argues that the Commission erred as a matter of law in its interpretation and application of subsections (A) and (B) of Code § 56-46.1 when it approved the overhead transmission line route. We review this issue of law de novo. Syed, 280 Va. at 68, 694 S.E.2d at 631.

JCC argues that the approval of the overhead transmission line's route "essentially ignor[ed] the statute's directive that the impacts on historic assets of the Commonwealth be minimized." The Commission did so, JCC contends, by limiting its "application of impact minimization" under the statute to a choice of routes presented by Dominion in its application for the CPCNs. JCC argues this effectively reduced the Commission's two-step mandate to establish need and minimize adverse impacts

32

to a "one-step process" by "us[ing] the determination of need to override its statutory duty to minimize the adverse impacts of the transmission line."

This argument is fundamentally the same as the argument raised by BASF in Part IV.A.2., supra.  We do note that JCC also invokes Code § 56-46.1(A), which states that "[w]henever the Commission is required to approve the construction of any electrical utility facility, it shall give consideration to the effect of that facility on the environment and establish such conditions as may be desirable or necessary to minimize adverse environmental impact . . . ."  "Minimize" does not require no impact, and the Commission is also required under subsection (A) to consider the economic development of the Commonwealth and service reliability.  Thus, our analysis from Part IV.A.2., supra, is equally applicable here.  For the reasons articulated previously, we find no error in the Commission's interpretation of the statute.

B.  Evidentiary Support for Approved Route

JCC's second assignment of error argues that the Commission erroneously found that the approved route for the Surry-Skiffes Creek Line reasonably minimizes adverse impacts under Code § 56-46.1.  As with BASF's evidentiary challenge, we must review the evidence with deference to the findings of the Commission, reversing only if the findings are "contrary to the evidence or

33

without evidentiary support." Level 3 Commc'ns, 268 Va. at 474, 604 S.E.2d at 72.

JCC argues that, based on the testimony of expert witnesses, the evidence before the Commission showed "overwhelmingly" that the route would have significant negative impacts on the historic assets in the Historic Triangle. JCC points specifically to the Colonial Parkway, Jamestown Island, the James River, the Captain John Smith National Historic Water Trail, and Carter's Grove. As to Carter's Grove, JCC relies on the testimony of expert witnesses who claimed that the impact would be "severe" because the current view from this historic home is "almost devoid of anything but river, as it was in colonial days." The ultimate opinion from a number of these witnesses upon which JCC relies is that there is no way to minimize these adverse impacts of the Surry-Skiffes Creek Line's James River crossing except to construct the line underground or elsewhere.

Despite this evidence, JCC argues, the Commission accepted Dominion's purported treatment of these adverse impacts as "insignificant" and therefore determined that "mitigation efforts and minimizing conditions were unnecessary." We disagree. We conclude that the record is not without evidence to support the Commission's determination that the selected

34

route _reasonably_ minimizes adverse impacts to the above-stated resources in the Historic Triangle.

As discussed in Part IV.A.2., _supra_, "_reasonably_ minimiz[ing] adverse impact[s]" involves weighing a multitude of factors.  Code § 56-46.1(B) (emphasis added).  In this case, the record shows that the Commission considered, in light of these factors, numerous alternatives, proposed by not only Dominion, but also James City County, BASF, environmental groups, the Commission's staff, and the Hearing Examiner.  These alternatives included transmission in different locations, lower voltage transmission, underground transmission, generation (that is, power plant) options, combinations of generation and transmission, and demand-side management (for example, lowering electric demand by consumers).

The record reflects that Dominion presented testimony from Peter Nedwick, a consulting engineer in electric transmission planning strategic initiatives, and Elizabeth Harper, Dominion's siting and permitting specialist.  Both testified that Dominion considered numerous generation alternatives before proposing the 500 kV Surry-Skiffes Creek Line.  Both offered testimony that the other proposed alternatives were inconclusive, insufficient in terms of capacity and time of completion, and/or cost prohibitive by comparison.  Of particular significance to this appeal is the evidence showing that (a) the inclusion of

35

anything less than a 500 kV line as part of a transmission solution would provide insufficient voltage for ensuring system reliability, and (b) constructing a 500 kV line underground at the James River crossing is not viable.

The parties do not dispute the finding that, as between the Surry-Skiffes Creek Line and the Chickahominy-Skiffes Creek Line, the evidence supports the Surry-Skiffes Creek Line. We nonetheless note that Harper testified that the Surry-Skiffes Creek Line was chosen in large part because of the large degree of wetlands and undeveloped land traversed by the Chickahominy-Skiffes Creek Line. By contrast, she stated the area where the Surry-Skiffes Creek Line would cross the James River is already impacted by more modern developments.

Dominion presented testimony from Douglas Lake, Technical Director of Natural Resource Group, LLC, which prepared Dominion's Environmental Routing Study, stating that the transmission line would not be visible from Williamsburg, Yorktown or most of Jamestown Island, including the Jamestown Settlement, the Jamestown Fort and visitor center areas. Where the line would be visible from one location on Jamestown Island and one location on the Colonial Parkway, it would be from three to six miles away. Harper further testified and presented evidence that the portion of the James River where the line would cross already contains modern developments currently

36

visible from this part of the river including, among other things, the Surry Nuclear Power Plant; Kingsmill, a resort community with a marina and a riverfront golf course; the Ghost Fleet, a collection of retired naval vessels anchored offshore from Fort Eustis; theme park rides; water towers; and a sewage treatment plant. Harper thus concluded that the line would not substantially change the character of the James River.

Harper further testified that, while visible from Carter's Grove, Variation 1 is located a mile offshore while Variations 4 and 4.1 are located approximately 1/2 mile offshore. Dominion thus argues that Variation 1 therefore minimizes adverse impacts as to Carter's Grove.

Considering this record, we cannot say that the Commission erred in concluding that the proposed route for the Surry-Skiffes Creek Line across the James River reasonably minimizes the line's adverse impacts. As the Commission observed, "[p]lacing a project in a particular location involves impacts but also avoids impacts associated with a different location." Here, the record is not without evidence to support the Commission's choice of location for the route in light of all competing considerations under the governing legal standards – including but not limited to adverse impacts on the scenic assets, historic districts and environment of the affected area.

## C. Skiffes Creek Switching Station

We now turn to JCC's third assignment of error in which it contends the Commission erred in its interpretation and application of Code § 56-46.1(F).

Code § 56-46.1(F) states: "Approval of a transmission line pursuant to this section shall be deemed to satisfy the requirements of [Code] § 15.2-2232 and local zoning ordinances with respect to such transmission line." The Commission construed "transmission line," as used in this provision, to include switching stations, so that Code § 56-46.1(F) exempted the Skiffes Creek Switching Station from the requirements of James City County zoning ordinances. This was error.

While it is true that this Court gives "great weight" to "the practical construction given to a statute by public officials charged with its enforcement," Commonwealth v. Appalachian Elec. Power Co., 193 Va. 37, 45, 68 S.E.2d 122, 127 (1951), we are not inextricably bound to that construction. If such a construction is based on a mistake of law, then this Court will not hesitate to reverse the decision of the public officials charged with the enforcement of the statute. See Virginia Elec. & Power Co. v. State Corp. Comm'n, 284 Va. 726, 736, 735 S.E.2d 684, 688 (2012).

This Court has recognized that, in determining whether certain structures or uses are exempt from local zoning

38

ordinances, there must be a "manifest intention on the part of the legislature" to do so. <u>City of Norfolk v. Tiny House, Inc.</u>, 222 Va. 414, 422-23, 281 S.E.2d 836, 840-41 (1981).

Although the Commission's position that switching stations and transmission lines function together and should be governed under the same authority is well-taken, the intention to exempt switching stations from local zoning ordinances is not manifest within Code § 56-46.1. Under the plain language of Code § 56-46.1(F) the only structures or uses expressly exempt from local zoning ordinances are transmission lines. Thus, because switching stations are not expressly exempt under Code § 56-46.1(F), the question before this Court is whether the term "transmission lines" includes switching stations.

As stated previously, "[w]hen construing a statute, our primary objective is to ascertain and give effect to legislative intent, <u>as expressed by the language used in the statute</u>." <u>Cuccinelli</u>, 283 Va. at 425, 722 S.E.2d at 629 (internal quotation marks and citation omitted) (emphasis added). The General Assembly's intent "is usually self-evident from the statutory language," and we look first to the plain meaning of the words used in the statute. <u>Rutter v. Oakwood Living Ctrs. of Va., Inc.</u>, 282 Va. 4, 9, 710 S.E.2d 460, 462 (2011) (citation and internal quotation marks omitted). Title 56 of the Code of Virginia, governing public utilities, does not define the term

"transmission line" as used in Code § 56-46.1(F).  However, determining the meaning of the term "transmission line" does not require analysis "[f]rom an engineering standpoint" as the Commission argues.  A layperson can identify the plain meaning of a transmission line:  the wires used to transmit electric current over great distances and the structures necessary to physically support those wires.  "Transmission line" does not mean "switching station."

A switching station remains just that:  a station.  A switching station is a facility, and thus is distinguishable from and more intrusive to its surrounding environment than transmission lines.  It is reasonable for such facilities to be subject to local zoning, while continuous transmission lines are exempt because of the onerous nature of navigating local zoning ordinances for all the acreage over which transmission lines cross.

The application itself delineates Project components as "lines" and a "station."  The Commission noted that "[t]he engineering evidence in this case also demonstrates that no 'transmission line' . . . will simply end at the property line of the Skiffes Creek Switching Station."  The fact that the transmission line continues does not by necessity incorporate the facility into the transmission line.  The station remains a

40

facility, and the plain language of "transmission line" under Code § 56-46.1(F) does not encompass a station facility.

We note the General Assembly has previously employed a similar definition.  In 2006, the General Assembly mandated that the Joint Legislative Audit and Review Commission ("JLARC"), a legislative oversight commission composed of nine members of the House of Delegates and five members of the Senate, see Code § 30-56, evaluate "the feasibility of undergrounding transmission lines in the Commonwealth."  H. J. Res. 100, Va. Gen Assem. (Reg. Sess. 2006).  As part of its evaluation, the JLARC conducted a comprehensive review of the Code and Commission policies with regard to transmission lines.  In its subsequent report, the JLARC defined "transmission lines" as "the conductors (wires or cables) which carry power at a high voltage level from the plants to local substations some distance away."  Joint Legislative Audit and Review Comm'n, Report to the Governor and General Assembly of Virginia: Evaluation of Underground Electric Transmission Lines in Virginia, House Doc. No. 87, at 4 (2006), available at http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/HD872006/$file/HD87.pdf (last visited March 25, 2015).

The Commission's rationale for its construction of the statute is that a switching station is "an electrically, physically, and operationally inseparable part of several high

41

voltage transmission lines."  Using this logic, an electrical generating facility would likewise be a transmission line for the purposes of Code § 56-46.1(F).  Without an electrical generating facility, a transmission line would be nonfunctioning and incomplete; therefore, according to the Commission's holding, the General Assembly also intended to regulate electrical generating facilities as transmission lines.  The language of the statute makes it clear that this was not the General Assembly's intent.

We also note the ease with which the General Assembly could have included substations in Code § 56-46.1(F), as exempt from local zoning ordinances, along with transmission lines, had that been its intent.  Code § 56-46.1(A) includes "any electrical utility facility," whereas Code § 56-46.1(B) addresses only "electrical transmission line[s]."  Both terms are contemplated under the same statute.

Here, the plain language of Code § 56-46.1(F) does not reflect a manifest intent on the part of the General Assembly to exempt switching stations from local zoning ordinances.  The Commission therefore committed a mistake of law.  Accordingly, we will reverse the decision of the Commission with regard to the applicability of Code § 56-46.1(F) to the Skiffes Creek Switching Station.

42

VI.  CONCLUSION

The Project under consideration today is not without weighty environmental and historical impacts to beloved areas of the Commonwealth, as well as pressing power needs to the residents of the Commonwealth.  This Court appreciates the contributions of all the parties in the lengthy deliberations before the Commission and this tribunal.  We make our decision with deep respect for the long-held level of deference accorded to the Commission, while recognizing our duty to uphold the law of the Commonwealth as written.

For the reasons stated herein, we conclude the Commission did not err in finding that Variation 1 reasonably minimizes adverse impacts.  We hold, however, that a switching station is not a "transmission line" under Code § 56-46.1(F).  Accordingly, we will affirm the orders as to appellant BASF, and affirm in part, reverse in part, and remand as to the JCC appellants.

Record Nos. 140462, 141009 & 141201 - <u>Affirmed.</u>

Record Nos. 140470 & 141010 – <u>Affirmed in part, reversed in part, and remanded.</u>

JUSTICE MIMS, with whom CHIEF JUSTICE LEMONS and JUSTICE McCLANAHAN join, concurring in part and dissenting in part.

I agree with the Court's analysis and conclusions regarding Code § 56-46.1(A) and (B), and I join in those portions of the opinion.  However, because I conclude that the Commission's

43

construction and application of Code § 56-46.1(F) is correct, I must respectfully dissent from Part V.C. of the Court's opinion.

We review the Commission's interpretation of a statute de novo. Appalachian Power Co. v. State Corp. Comm'n, 284 Va. 695, 703, 733 S.E.2d 250, 254 (2012). However, "the practical construction given by the Commission to a statute it is charged with enforcing is entitled to great weight by the courts and in doubtful cases will be regarded as decisive." Piedmont Envtl. Council v. Virginia Elec. & Power Co., 278 Va. 553, 563, 684 S.E.2d 805, 810 (2009) (internal quotation marks and citations omitted).

The Hearing Examiner began his analysis with the statutory text. See Appalachian Power Co., 284 Va. at 705, 733 S.E.2d at 255 ("In any case involving statutory construction we begin with the language of the statute."). Because the term "transmission line" is undefined, the Hearing Examiner turned to previous decisions of the Commission, a decision of the Maine Public Utilities Commission, the common dictionary definitions of "transmission line" and "circuit," and the definition of "transmission line" supplied by the North American Electric Reliability Corporation ("NERC").[1] The Hearing Examiner properly

---

[1] The Federal Energy Regulatory Commission ("FERC") has designated NERC as the Electric Reliability Organization for the United States, and the Energy Policy Act of 2005 made NERC's

44

considered these sources in reaching the conclusion that the term "transmission line" includes facilities such as the Skiffes Creek Switching Station.

Similarly, the Commission observed that the Code does not define "transmission line."  After reviewing the parties' arguments, and noting the Hearing Examiner's "substantial analysis," the Commission then relied on its expertise in such matters to observe that the "Skiffes Creek Switching Station will be an electrically, physically, and operationally inseparable part" of the transmission facilities.  The Commission therefore concluded that the Skiffes Creek Switching Station constitutes "a part of any transmission line for purposes of Code § 56-46.1(F)."

In the Commonwealth, electrical power is supplied via a three part system: generation, transmission, and distribution. See Code § 56-576; Joint Legislative Audit and Review Comm'n, Report to the Governor and General Assembly of Virginia: Evaluation of Underground Electric Transmission Lines in Virginia, House Doc. No. 87, at 2 (2006), available at http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/HD872006/$file/HD87.pdf (last visited April 7, 2015) ("JLARC Report").  In the Virginia Electric Utility Regulation Act, the General Assembly

reliability standards mandatory, subject to FERC's oversight. See Pub. L. No. 109-85, 119 Stat. 594, 941 (2005) (codified at 16 U.S.C. § 824o).

45

has defined the "[t]ransmission system" as "those facilities and equipment that are required to provide for the transmission of electric energy."  Code § 56-576.  In turn, "[t]ransmission" refers to the "transfer of electric energy through the Commonwealth's interconnected transmission grid from a generator to either a distributor or a retail customer."  Id.  Meanwhile, "generation" means "the production of electric energy," and "distribution" refers to "the transfer of electric energy through a retail distribution system to a retail customer."  Id. Thus, the General Assembly has defined the transmission system to extend from the point of generation to the point of distribution.  As the statutory definitions demonstrate, there is a functional distinction between these terms.  An electrical generating facility is not a transmission facility, and a distribution facility is not a transmission facility.  However, each is a type of "electric utility facility."  See Code § 56-46.1; see also Code § 56-576 (defining "electric utility").

Transmission lines generally operate at high voltages — considerably higher than distribution lines.  See JLARC Report, at 5 (noting that the "most common voltage for transmission lines is 230 kilovolts (kV)" while distribution lines "generally operate at lower voltages of 34.5 kV or less").  The record indicates that the Skiffes Creek Switching Station will have the capacity to step the voltage down from 500 kV to 230 kV and from

46

230 kV to 115 kV.  It will also link 7.4 miles of new 500 kV transmission line to 20.2 miles of new 230 kV transmission line, thereby connecting the Surry Switching Station and Whealton Substation.  Nothing in the record indicates that the Skiffes Creek Switching Station will step the voltage down to levels associated with distribution.  Therefore, the record reflects that the Skiffes Creek Switching Station is functionally part of the transmission system.  See Code § 56-576.

Furthermore, JLARC recognized that the terms "circuit" and "line" are "often used synonymously," but explained that a line may have one or more circuits.  JLARC Report, at 3.  As the Hearing Examiner recognized, the dictionary definition of a "transmission line" refers to its function as a "circuit."[2]  The Hearing Examiner and the Commission reasoned that the purpose of the Skiffes Creek Switching Station is to complete a transmission circuit, the path between the Surry Switching Station and the Whealton Substation.  Thus, it is an integral part of the transmission line.

---

[2] A "transmission line" is "a metallic circuit of three or more conductors used to send energy usu. at high voltage over a considerable distance; specif : a usu. metallic line used for the transmission of signals or for the adjustment of circuit performance and often consisting of a pair of wires suitably separated, a coaxial cable, or a wave guide."  Webster's Third New International Dictionary 2429 (1993).  In turn, a "circuit" is "the complete path of an electric current including any displacement current."  Id. at 408.

Finally, the fact that a transmission switching station is a facility does not make it more reasonable for it to be subject to a local zoning ordinance than the remainder of the transmission line. Indeed, under the majority opinion, if an electric utility obtains the Commission's approval under Code § 56-46.1(A) and (B) for the location of a transmission line, but fails to obtain permission from local zoning authorities for transmission switching stations, the approval under Code § 56-46.1(A) and (B) would be meaningless. The electric utility would have to adjust the route of the transmission line until all local zoning authorities permit locations for all such stations. Yet Code § 56-46.1(F) provides that the Commission's approval of a transmission line satisfies local zoning ordinances "with respect to" that transmission line. Clearly, the Commission's approval of the line also must satisfy local zoning ordinances with respect to everything necessary for the transmission line to function as such.

For these reasons, I believe the relevant question is whether a facility is designed to facilitate transmission or to facilitate distribution or to facilitate generation of electricity within the Commonwealth. See Code § 56-576. Clearly, the Skiffes Creek Switching Station is designed to facilitate, and in fact is integral to, the transmission of electricity. The Commission's practical construction gives

48

effect to the function-based distinctions established by the General Assembly.  Moreover, it adheres to well-established principles of statutory construction.  For these reasons, I would affirm the decision of the Commission with respect to its interpretation and application of Code § 56-46.1(F).